# SUPREME COURT OF THE UNITED STATES

———————

No. 25A914

———————

## NICOLE MALLIOTAKIS, ET AL. *v.* MICHAEL WILLIAMS, ET AL.

### ON APPLICATION FOR STAY

———————

No. 25A915

———————

## PETER KOSINSKI, ET AL. *v.* MICHAEL WILLIAMS, ET AL.

### ON APPLICATION FOR STAY

[March 2, 2026]

The applications for stay presented to JUSTICE SOTOMAYOR and by her referred to the Court are granted. The January 21, 2026 order entered by the Supreme Court of the State of New York, New York County, Index No. 164002/2025, is stayed pending the disposition of the appeal in the New York state courts and disposition of a petition for a writ of certiorari in this Court, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the issuance of the mandate of this Court.

JUSTICE ALITO, concurring in grant of stay.

These cases concern a state-court order that blatantly discriminates on the basis of race. The New York Supreme Court (that State's trial-level court) ordered the New York Independent Redistricting Commission to draw a new congressional district for the express purpose of ensuring that "minority voters" are able to elect the candidate of their choice. 1 App. to Emergency Application for Stay 15a.

That is unadorned racial discrimination, an inherently "'odious'" activity that violates the Fourteenth Amendment's Equal Protection Clause except in the "most extraordinary case." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 208 (2023). Extraordinary circumstances exist only when the challenged state conduct is narrowly tailored to achieve a "compelling" interest, and our precedents have identified only two compelling interests that can justify race-based government action: (1) mitigating prison-specific risks and (2) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Id.*, at 206–207. Neither of those interests is present here. Instead, the court based its injunction on an interpretation of state law. But under the Supremacy Clause, a state law cannot authorize the violation of federal rights. It is therefore an understatement to say that applicants are likely to succeed on the merits of their equal protection claim.

Despite this, the New York courts refused to stay the trial court's order. After that highly questionable injunction was issued, the applicants filed appeals in both the Appellate Division (the State's intermediate appellate court) and the Court of Appeals (its highest court) challenging the trial court's order on federal constitutional grounds. At the same time, applicants asked both courts to stay the trial court's order. The Appellate Division refused to issue a stay, and by order issued on February 11, the Court of Appeals sent the appeal filed in that court to the Appellate Division and dismissed applicants' motions for a stay.

With nowhere else to turn, the applicants asked us to issue a stay, and we have jurisdiction to entertain their application. Title 28 U. S. C. §1257(a) gives us jurisdiction to review "[f]inal judgments or decrees" that are rendered by a State's highest court and adjudicate federal constitutional claims, and the Court of Appeals' February 11 order falls within that category. Our decision in *National Socialist*

*Party of America* v. *Skokie*, 432 U. S. 43, 44 (1977) (*per curiam*), makes that clear. In that case, a trial court issued an injunction that prohibited petitioner's members from engaging in various forms of expression. Without providing any reasoning, both the State's intermediate appellate court and supreme court denied applications for a stay pending appeal, and the latter court also refused to hear the stay applicants' appeal prior to the time when their constitutional rights would be violated. See App. to Application for Stay in *National Socialist Party of America* v. *Skokie*, O. T. 1976, No. 76-1786, pp. 5a–7a (unreasoned orders by the State's intermediate and supreme courts). We held that by "den[ying] both the stay and leave for an expedited appeal," the State Supreme Court was necessarily rendering a final judgment or decree on "the merits of petitioners' claim that the outstanding injunction will deprive them of rights protected by the" Constitution "during the period of appellate review." *Skokie*, 432 U. S., at 43–44. The same is true here: The New York Court of Appeals' decision not to grant a stay or hear a direct appeal was effectively a final determination on the merits of the applicants' claim that the outstanding injunction is depriving them of their constitutional rights pending appeal. Because the situation here is not materially different from that in *Skokie*, we have jurisdiction.

We are likewise authorized to grant a stay because it is "necessary or appropriate in aid of [our] jurisdiction." 28 U. S. C. §1651(a). That requirement is met when a stay is "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281, 295 (1970).

That is the situation here because there is an unacceptably strong possibility that the applicants' appeal in the state court system will not conclude until it is too late for us to

review the ultimate decision by means of a writ of certio-
rari, even if it appears that the decision is based on a seri-
ously mistaken understanding of the Constitution.   By
then, the principle of restraint we recognized in *Purcell* v.
*Gonzalez*, 549 U. S. 1 (2006) (*per curiam*), may counsel
against the issuance of an injunction.  An injunction is an
equitable remedy, and such relief may be inequitable if it is
issued shortly before an election, when candidates, election
officials, and voters have relied on the rules in place at that
time.  *Ibid.*

At this point, however, the *Purcell* principle does not
counsel against a stay.  That principle concerns "[l]ate judi-
cial tinkering" that "can lead to disruption and to unantici-
pated and unfair consequences for candidates, political par-
ties, and voters, among others."  *Merrill* v. *Milligan*, 595
U. S. ___, ___ (2022) (KAVANAUGH, J., concurring in grant
of application for stay) (slip op., at 4).  Here, our stay, far
from causing disruption or upsetting legitimate expecta-
tions, eliminates much of the uncertainty and confusion
that would exist if the Independent Redistricting Commis-
sion proceeded to draw a new district that this Court would
likely strike down if the cases reached us in time.

For these reasons, the stay issued by the Court rests on
sound and well-established legal grounds.  JUSTICE
SOTOMAYOR's accusation of two-faced practice, *post,* at 1, is
baseless, and her 13-page dissent is most notable for what
it conspicuously omits: even the most tepid imaginable de-
fense of the constitutionality of the trial court's order.  In-
stead, her disquisition ducks that issue and demands that
we wait until the completion of a series of events that would
likely run out the clock before we could review the order.
That would provide a way of achieving what full review
would not permit: the use of an unconstitutional district in
the November election and the election of a Member of the
House of Representatives whose entitlement to the office
would be tainted.  That is a prospect this Court should not
countenance.

# SUPREME COURT OF THE UNITED STATES

_____

No. 25A914

_____

NICOLE MALLIOTAKIS, ET AL. *v.* MICHAEL
WILLIAMS, ET AL.

ON APPLICATION FOR STAY

_____

No. 25A915

_____

PETER KOSINSKI, ET AL. *v.* MICHAEL
WILLIAMS, ET AL.

ON APPLICATION FOR STAY

[March 2, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and
JUSTICE JACKSON join, dissenting from grant of stay.

The Court's 101-word unexplained order can be summa-
rized in just 7: "Rules for thee, but not for me." Time and
again, this Court has said that federal courts have limited
jurisdiction. Time and again, this Court has said that fed-
eral courts should not interfere with state-court litigation.
Time and again, this Court has said that federal courts
should not meddle with state election laws ahead of an elec-
tion. Today, the Court says: except for this one, except for
this one, and except for this one. Ignoring every limit on
federal courts' authority, the Court takes the unprece-
dented step of staying a state trial court's decision in a re-
districting dispute on matters of state law without giving
the State's highest court a chance to act. Because that or-
der violates basic principles of jurisdiction, federalism, and
equity, I respectfully dissent.

I

New York's Eleventh Congressional District is located in New York City and covers all of Staten Island and part of southwestern Brooklyn. Representative Nicole Malliotakis currently represents the district.

In October 2025, New York voters sued state election officials in the Supreme Court of New York, the State's trial court, to challenge the district's lines. They claimed that the district as drawn violates the New York Constitution because it dilutes Black and Latino votes. Representative Malliotakis intervened to defend the current map.

Following a 4-day trial in early January, the trial court sided with the voters. It first observed that this action presented "an issue of first impression" because "New York courts have yet to determine the appropriate legal standard to evaluate a vote dilution claim" under the New York Constitution. *Williams* v. *Board of Elections*, ___ N. Y. S. 3d ___, ___, 2026 N. Y. Slip Op. 26015, \*2 (Jan. 21, 2026). Applying a new legal standard, the trial court held that, based on the totality of the circumstances, the district as drawn denied Black and Latino voters the equal "opportunity to participate in the political process . . . and to elect representatives of their choice" guaranteed to them by Article III, §4, of the New York Constitution.

The trial court then enjoined New York's current congressional map and ordered New York's Independent Redistricting Commission to redraw the district as a "crossover" district that met three criteria.[1] First, under the remedial

_____

[1] A crossover district is one in which minority voters do not constitute a majority in a district but are able to elect their preferred candidates through "crossover" support from White voters. The trial court's discussion of crossover districts relied heavily on Justice Souter's separate writings, which have been especially influential in this area. See *Williams* v. *Board of Elections*, ___ N. Y. S. 3d ___, ___, 2026 N. Y. Slip Op. 26015, \*6 (Jan. 21, 2026); see also *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 484–491 (2006) (Souter, J., concurring in

district's lines, minority voters must be able to elect their preferred candidates in primary elections. Second, minority-favored candidates must typically win general elections. Third, the district must ensure that minority voters' support is decisive in primary elections. The court's order also made clear that the case would not be "resolved until the successful implementation of a new Congressional Map complying with [its] order." \_\_\_ N. Y. S. 3d, at \_\_\_, 2026 N. Y. Slip Op. 26015, *8. As of today, the Commission has not yet drawn a new district.

Defendants appealed to both the Appellate Division (New York's intermediate court) and the Court of Appeals (New York's highest court) on January 26 and simultaneously sought a stay pending appeal from both courts. Together, they argued that the trial court's order requiring a new district to be drawn violates the Federal Due Process Clause, Elections Clause, and Equal Protection Clause even before any new district had been drawn. On February 11, the Court of Appeals transferred its appeal to the Appellate Division on the grounds that defendants could not first appeal directly to the Court of Appeals. See 1 App. to Emergency Application 20a–21a (App.); see also N.Y. Const., Art. VI, §3b(2); N. Y. C. P. L. R. §5601(b)(2).

The next day, without a response from the Appellate Division, defendants applied to this Court for an emergency stay pending appeal. While the applications were pending, the Appellate Division denied a stay pending appeal. Supp. App. 102–103. Since that denial, defendants have neither sought leave to appeal the denial nor asked for a stay from the New York Court of Appeals, an obvious place "to turn" to for relief, see *ante,* at 2; see also N. Y. C. P. L. R. §§5519, 5602.

—————

part and dissenting in part); *Bartlett* v. *Strickland,* 556 U. S. 1, 31–35 (2009) (Souter, J., dissenting) (discussing crossover claims under §2 of the Voting Rights Act); see also *id.*, at 22 (plurality opinion) (discussing Justice Souter's proposed definition).

II

Today, the Court takes the astonishing, unexplained step of staying a state trial court's order before the state high court has had a chance to weigh in. To do so, the majority had to conclude that it has jurisdiction to act, that acting now is consistent with the bedrock federalism values underlying its jurisdictional limits, and that the equities favor granting this relief despite the Court's repeated admonitions to proceed cautiously when intervening in state elections or court proceedings. The Court goes badly wrong at every turn.

A

To begin, this Court has repeatedly held that federal courts are courts of limited jurisdiction. See, *e.g.*, *Hain Celestial Group, Inc.* v. *Palmquist*, 607 U. S. ___, ___ (2026) (slip op., at 1); *Kempe's Lessee* v. *Kennedy*, 5 Cranch 173, 185 (1809) (Marshall, C. J., for the Court). If a lower federal court lacks jurisdiction, then it cannot act. *Hain*, 607 U. S., at ___ (slip op., at 5).

This Court's jurisdiction is supposed to be limited too, especially as to state-court proceedings. Title 28 U. S. C. §1257(a) allows this Court to review "[f]inal judgments or decrees rendered by the highest court of a State" that implicate federal law. As this Court has explained, §1257(a) "establishes a firm final judgment rule," requiring a state-court judgment to be final "'in two senses: it must be subject to no further review or correction in any other state tribunal; it must also be final as an effective determination of the litigation and not of merely interlocutory or intermediate steps therein.'" *Jefferson* v. *City of Tarrant*, 522 U. S. 75, 81 (1997). Put simply, the decision on review "'must be the final word of a final court.'" *Ibid.*

Here, there is no final decision from any state court, let alone New York's highest court, on any federal question. After the New York trial court entered its interim order,

defendants ran to this Court and sought a stay of that order before either the Appellate Division or the Court of Appeals had weighed in on the merits. Needless to say, an order by a state trial court is not a decision by "the highest court of a State." §1257(a). While these applications were pending before this Court, the Appellate Division denied a stay. The Appellate Division's order cannot satisfy §1257(a), however, because that denial is reviewable by the New York Court of Appeals. See N. Y. C. P. L. R. §5602. Yet defendants have not even asked the Court of Appeals to act following the Appellate Division's denial.

This procedural defect should be fatal. In every other case in which this Court has granted emergency relief from a state-court decision, the State's highest court either denied it first or failed to act promptly on a request for it. See, *e.g.*, *National Socialist Party of America* v. *Skokie*, 432 U. S. 43, 43–44 (1977) (*per curiam*); *CBS Inc.* v. *Davis*, 510 U. S. 1315, 1316 (1994) (Blackmun, J., in chambers); *Volkswagenwerk A. G.* v. *Falzon*, 461 U. S. 1303, 1303–1305 (1983) (O'Connor, J., in chambers); *M. I. C., Ltd.* v. *Bedford Township*, 463 U. S. 1341, 1342–1343 (1983) (Brennan, J., in chambers); *Nebraska Press Assn.* v. *Stuart*, 423 U. S. 1327, 1328–1329 (1975) (Blackmun, J., in chambers). That is true even of cases that came to this Court through New York courts. In *Yeshiva Univ.* v. *YU Pride Alliance*, 597 U. S. \_\_\_ (2022), for instance, this Court denied an emergency application to stay a permanent injunction entered by a New York trial court because "applicants h[ad] at least two further avenues for expedited or interim state court relief," including by seeking a stay from the New York Court of Appeals. *Id.*, at \_\_\_ (slip op., at 1); see also *New Jersey Transit Corp.* v. *Colt*, 606 U. S. 1051 (2025) (staying state-court trial only after applicants were denied relief by the Appellate Division and the Court of Appeals, see Application for Stay, O. T. 2024, No. 25A287, p. 2).

Defendants contend that they cannot ask the Court of Appeals for relief. Not so. Although the Court of Appeals previously transferred their appeal to the Appellate Division, it did so because it lacked jurisdiction over the initial direct appeal of the trial court's order that had bypassed the Appellate Division. See App. 20a–21a (citing N.Y. Const., Art. VI, §§3b(2), 5(b); N. Y. C. P. L. R. §5601(b)(2)). In denying a procedurally improper appeal, the Court of Appeals did not close its doors to a procedurally proper one later. JUSTICE ALITO claims that *National Socialist Party of America* v. *Skokie*, 432 U. S. 43, "makes . . . clear" that this transfer order is a final judgment under §1257(a). *Ante*, at 2–3 (concurring opinion). That is wrong. In *Skokie*, petitioners sought, and were denied, interim relief from the state intermediate and high courts before seeking relief from this Court. 432 U. S., at 43–44. Based on those denials of relief, the Court concluded that the state high court had "finally determined the merits of petitioners' claim." *Id.*, at 44. No such determination has occurred here. The New York Court of Appeals did not resolve anything on the merits, much less finally, when it told defendants to seek relief from the Appellate Division first.[2]

As for the Appellate Division, defendants claim that that court denied them leave to appeal the denial of stay. It did no such thing: All it did was deny their request for leave to appeal the trial court's order directly to the Court of

_____

[2] *Skokie* is also distinguishable because it involved a prior restraint on speech. This Court has long held that a prior restraint carries "a heavy presumption against its constitutional validity" and can be "tolerated" only where a litigant may seek "an almost immediate judicial determination of the validity of the restraint." *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 70 (1963). This Court has not expanded this exception beyond that uniquely unconstitutional type of law. 16B C. Wright, A. Miller, and E. Cooper, Federal Practice and Procedure §4010 (3d ed., 2025 Supp.) (*Skokie* "may signify little for general doctrine" because it "rested finality on such special reasons" and "has not yet had a sweeping impact on general finality doctrine").

Appeals. Supp. App. 102–103. Besides, even if the Appellate Division denied defendants leave to appeal the denial of stay, defendants still may seek that same relief from the Court of Appeals directly. N. Y. C. P. L. R. §5519(c); §5602(a)(2) (permitting a litigant to seek leave to appeal from the Court of Appeals "upon refusal by the appellate division" as to "an order of the appellate division which does not finally determine [the] proceeding").

Until defendants try to obtain relief from New York's highest court, this Court cannot and should not act. That defendants have not taken that modest step should have resulted in the denial of the stay they seek.[3]

### B

The limits on this Court's authority to review state courts' judgments exist for a reason: They reinforce basic federalism values. This Court has long held that, consistent with States' sovereignty, state courts can resolve both federal- and state-law issues. See *Claflin* v. *Houseman*, 93 U. S. 130, 136–137 (1876). This Court has also recognized that, as early as 1793, "Congress adopted a general policy under which state proceedings 'should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court.'" *Chick Kam Choo* v. *Exxon Corp.*, 486 U. S. 140, 146 (1988); see 28 U. S. C. §2283. This policy of allowing state courts to adjudicate cases free of federal interference, even when those cases involve federal issues, "is a necessary concomitant of the Framers' decision to authorize, and Congress' decision

---

[3] JUSTICE ALITO faults me for "duck[ing]" the merits. *Ante,* at 4. Jurisdictional rules, however, do not depend on the underlying merits. *Lance* v. *Coffman*, 549 U. S. 437, 439 (2007) (*per curiam*) (Federal courts "must determine that they have jurisdiction before proceeding to the merits"); but see *ante,* at 1–2 (discussing merits before jurisdiction).

to implement, a dual system of federal and state courts." *Chick Kam Choo*, 486 U. S., at 146.

To persuade this Court to violate these principles and interfere with the New York courts, defendants assert that this Court must act now because doing so is "necessary or appropriate in aid of [this Court's] jurisdictio[n]" under the All Writs Act. §1651(a). That assertion is perplexing. This Court lacks jurisdiction over the trial court's interlocutory order, see *supra*, at 4–7, and "[w]e have long held [that t]he authority to issue a writ under the All Writs Act is not a font of jurisdiction," *United States* v. *Denedo*, 556 U. S. 904, 914 (2009).

Even assuming that that Act permits this Court to go beyond its jurisdictional limits, it requires that the Court's actions today aid its ability to hear and decide a federal question later.[4] See *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281, 295 (1970). The majority's unreasoned order, however, gives no reasons at all for why its intervention meets that requirement. Defendants, for their part, argue that this Court's intervention is needed because the primary election is right around the corner. If this Court does not act now, they say, then it will not be able to act before the election.

That argument starts from a flawed premise. It assumes, for no apparent reason, that this Court will need to act at all, never mind by any deadline. If the trial court's federal constitutional errors are as obvious as defendants claim they are, then the Court of Appeals could very well give them the relief they seek. The Court of Appeals also could decide that the trial court decided a novel question of state constitutional law incorrectly or that the novelty of the

---

[4] Title 28 U. S. C. §2101(f) also does not authorize the relief defendants seek. That statute permits this Court to stay a "final judgment or decree of any court [that] is subject to review by the Supreme Court on writ of certiorari." For all the reasons explained in the text, there is no final judgment reviewable by this Court.

state-law question warrants a stay pending appeal. It also could decide that the trial court erred on any one of several independent state-law grounds that defendants have raised in the courts below. See Brief for Respondent Kathy Hochul et al. 16–20. Yet neither defendants nor the majority afford the Court of Appeals a chance to do any of those things.

Next, defendants' supposed time constraints are illusory. The general election is eight months away and the primary is about four months away. That is more than enough time for defendants to, at the very least, seek a stay from the Court of Appeals. It is also enough time for the New York courts to decide this case finally on the merits. The New York courts are surely aware that their State is without a congressional districting plan in the middle of an election year and that they must act swiftly in the weeks ahead. The New York Constitution directs state courts to do just that: They must prioritize apportionment disputes above all other matters. See Art. VI, §5. New York courts take that command seriously. In 2022, for example, the Appellate Division decided an appeal in a partisan gerrymandering challenge in just 21 days. As for the Court of Appeals, it needed only 6.[5]

Even if 6 days is still somehow not fast enough for the majority, New York courts can move the primary election date. They did just that in 2022 to leave enough time to resolve state-court litigation, ensure that state law was being followed, and give the State enough time to implement new maps before the election. See *United States* v. *New York*, 2022 WL 1473259, *1 (NDNY, May 10, 2022); see also *Harkenrider* v. *Hochul*, 38 N. Y. 3d 494, 522, 197 N. E. 3d 437, 454–455 (2022).

---

[5] The trial court issued its decision on March 31, 2022. *Harkenrider* v. *Hochul*, 173 N. Y. S. 3d 109. The Appellate Division decided the appeal on April 21, 2022. *Harkenrider* v. *Hochul*, 204 App. Div. 3d 1366, 167 N. Y. S. 3d 659. The Court of Appeals issued its decision on April 27, 2022. *Harkenrider* v. *Hochul*, 38 N. Y. 3d 494, 197 N. E. 3d 437.

In short, there is every reason to think that the New York courts will fully, swiftly, and prudently resolve this case before the primary election. Basic federalism principles, which have bound federal courts since the founding, require giving the New York courts a fair opportunity to do so. The majority, however, denies them that chance.

C

The majority's decision to grant relief here is also irreconcilable with its repeated admonishing of lower federal courts not to interfere with state election laws on the "eve of an election." *Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*). Known as the "*Purcell* principle," this doctrine generally holds that, because late-breaking changes to election procedures can cause chaos, federal courts should hesitate before exercising their equitable discretion to alter state election laws close to an election. *Merrill* v. *Milligan*, 595 U. S. ___, ___ (2022) (KAVANAUGH, J., concurring in grant of application for stays) (slip op., at 4); see also *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*). Importantly, this Court has never applied *Purcell* to prevent state courts from adjudicating state-law election disputes, even when state-court action might cause "confusion," *ante,* at 4. "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." See *Milligan*, 595 U. S., at ___ (slip op., at 4) (opinion of KAVANAUGH, J.).

The Court has deployed *Purcell* at least three times in the last five years to stay federal-court injunctions of state redistricting plans months ahead of an upcoming election. Just this past December, the Court relied on *Purcell* to stay a Federal District Court's injunction against Texas's congressional districting plan ahead of the primary election in March. *Abbott* v. *League of United Latin American Citizens*,

607 U. S. \_\_\_, \_\_\_ (2025) (*LULAC*) (slip op., at 2); see *id.*, at \_\_\_ (KAGAN, J., dissenting from grant of application for stay) (slip op., at 15). That District Court, this Court chided, "improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections." *Id.*, at \_\_\_ (majority opinion) (slip op., at 2). Similarly, this Court stayed a Federal District Court's injunction of Alabama's congressional districts issued four months ahead of the next primary election, even though this Court later held that map unlawful. *Milligan*, 595 U. S., at \_\_\_ (slip op., at 1); see *id.*, at \_\_\_ (KAGAN, J., dissenting from grant of application for stays) (slip op., at 10); *Allen* v. *Milligan*, 599 U. S. 1, 23 (2023). It even stayed a federal injunction of Louisiana's congressional districts more than six months before the next election. *Robinson* v. *Callais*, 601 U. S. \_\_\_ (2024) (slip op., at 1); see *id.*, at \_\_\_ (JACKSON, J., dissenting from grant of applications for stay) (slip op., at 2).

I disagreed with the majority's position in those cases that the "eve" of an election is four (never mind six) months long. Apparently, the majority now thinks so too, but only for this case. Four months before an election may be too late for a lower federal court to act, but it is not too late for this Court to upend a State's administration of its own election laws. What was "imprope[r]" just this past December, *LULAC*, 607 U. S., at \_\_\_ (slip op., at 2), is now "necessary or appropriate," 28 U. S. C. §1651(a). Both state courts and lower federal courts deserve more than the majority's unexplained about-face.[6]

Some Members of this Court have expressed the view that *Purcell* does not bar federal-court action when "the underlying merits are entirely clearcut in favor of the

———————

[6] JUSTICE ALITO suggests that this Court must act today because *Purcell* might prevent it from acting later. *Ante,* at 4. In so doing, he turns what is supposed to be a "principle of restraint," *ibid.*, into an excuse for intemperance.

plaintiff."    *Milligan*, 595 U. S., at ___ (opinion of KAVANAUGH, J.) (slip op., at 5).  Whatever clarity the majority may have found in this case is hard to discern.  The trial court's order, to be sure, calls for creating a crossover district, and Members of this Court have previously noted that intentionally creating such a district raises "serious constitutional questions." *Bartlett* v. *Strickland*, 556 U. S. 1, 18 (2009) (plurality opinion) (addressing crossover districts).  Even so, no remedial district has been drawn yet, and it is not remotely clear that one would have been drawn after the New York appellate courts reviewed the trial court's decision.  The majority, however, seems to have no doubts that whatever district may or may not be drawn necessarily will violate the Federal Constitution, regardless of how it might be configured, regardless of how the New York Independent Redistricting Commission might go about drawing it, and regardless of what state law might actually require.  All this, even though this Court has purposefully left open the constitutionality of crossover districts.  See *Bartlett*, 556 U. S., at 21 (plurality opinion); see also *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. 178, 192 (2017) (holding that "the use of an express racial target" in redistricting must be evaluated in context based on the district as a whole).  The Court should not so prematurely and dismissively decide so serious a question.[7]

_____

[7] Far from "baseless," *ante,* at 4, my opinion is based entirely on what JUSTICE ALITO and the majority have done in the recent past.  JUSTICE ALITO frets that if the Court does not act today, then New York may be able to hold an election using an illegal map.  *Ibid.*  Yet he himself relied on *Purcell* just four years ago to permit Alabama to hold an election using a map that this Court later held was unlawful under a "faithfu[l] appli[cation of] our precedents" and "the law as it exists." *Allen* v. *Milligan*, 599 U. S. 1, 23 (2023); *Merrill* v. *Milligan*, 595 U. S. ___, ___ (2022) (KAVANAUGH, J., joined by ALITO, J., concurring) (slip op., at 2).  In any event, JUSTICE ALITO's fears are unwarranted.  Again, the general election is eight months away.  During that time, defendants could seek a stay of the trial court's order before the Court of Appeals, or reversal on

SOTOMAYOR, J., dissenting

\*      \*      \*

If this Court's grasping reach extends even to a nonfinal decision of a state trial court, then every decision from any court is now fair game.  By granting these applications, the Court thrusts itself into the middle of every election-law dispute around the country, even as many States redraw their congressional maps ahead of the 2026 election.  It also invites parties searching for a sympathetic ear to file emergency applications directly with this Court, without even bothering to ask the state courts first.  There is much reason to question whether the majority will exercise its new-found authority wisely, but there is no reason to question this: If you build it, they will come.

I respectfully dissent.

––––––––––
the merits before both the Appellate Division and the Court of Appeals. If neither of those courts grants them relief, then a new map will have to be devised and implemented to replace the enjoined one so that a general election can occur in November.  Thus, there will be some juncture in the months ahead at which defendants could return to this Court with an order that actually falls within its jurisdiction.